**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Cindy E. Myers, | ) | No. CV-05-504-PHX-FJM |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Scottsdale Bariatric Center, et al. | ) | |
| Defendants. | ) | |

Cindy Myers was hired by the Scottsdale Bariatric Center ("Bariatric Center") in Scottsdale, Arizona as a billing manager. The following year, on September 27, 2003, she was diagnosed with lymphocytic leukemia, a form of cancer. On October 4, 2003, she began treatment at a hospital in Houston, Texas. Within two weeks, the Bariatric Center terminated her employment. She then filed this action, alleging that the Bariatric Center and Robin Blackstone, M.D., its founder, sole shareholder and president, are liable for violations of the Americans with Disabilities Act ("ADA"), the Arizona Civil Rights Act ("ACRA"), and for the intentional infliction of emotional distress. We have before us defendants' motion for summary judgment (doc. 34), the response and the reply.

**I**

For an employer to be subject to the provisions of either the ADA or the ACRA, the employer must employ more than 15 employees. 42 U.S.C. § 12111(5); A.R.S. § 41-1461(4)(a). The purpose of this restriction on applicability "is not to encourage or condone

discrimination; . . . [it] is to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail." Papa v. Katy Indus., Inc., 166 F.3d 937, 940 (7th Cir. 1999). The Bariatric Center did not employ more than 15 employees during the requisite period. Plaintiff contends, however, that the Bariatric Center is integrated with Scottsdale Healthcare Shea Hospital ("Scottsdale Healthcare"), and that together, the unit employs more than 15 employees.

We consider four factors in determining whether two entities are sufficiently integrated for purposes of the ADA and the ACRA: 1) interrelation of operations, 2) common management, 3) centralized control of labor relations, and 4) common ownership or financial control.[1] Kang v. U. Lim Am., Inc., 296 F.3d 810, 815 (9th Cir. 2002); Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 993-94 (6th Cir. 1997). "None of these factors is conclusive, and all four need not be met in every case." Swallows, 128 F.3d at 994. However, centralized control of labor relations is the "most critical" factor. Kang, 296 F.3d at 815 (quoting Hukill v. Auto Care, Inc., 192 F.3d 437, 442 (4th Cir. 1999)). Accordingly, "[i]t has been said that the 'integrated employer' test instructs a court to determine what entity made the final decisions regarding employment matters related to the person claiming discrimination." Hukill, 192 F.3d at 444 (quotation omitted).

The relationship between the Bariatric Center and Scottsdale Healthcare is largely undisputed. The Bariatric Center has the exclusive right to provide surgeons for bariatric surgery at Scottsdale Healthcare. Scottsdale Healthcare provides everything else associated with the surgery including facilities, equipment, support staff and record keeping. Because the entities provide interdependent services for bariatric patients, their work is largely cooperative. For example, they attempt to ensure that they accept the same insurance plans, there is a phone number at the hospital where a caller can get information on the Bariatric

---

[1] These factors are applicable to the ADA, and it is undisputed that they are likewise applicable to the ACRA. Therefore we assume without deciding that the analysis pursuant to the ADA is applicable to the ACRA.

Center, and they have participated in joint marketing campaigns.[2] The cooperation is undoubtedly aided by Blackstone's role as the medical director for Scottsdale Healthcare bariatric services, where she is "responsible for the over-all direction and coordination of professional medical care within Bariatric Services,"[3] <u>DSOF, Exhibit 1.B.</u> at 47, and by her role as the subcommittee chair of Scottsdale Healthcare bariatric surgery. However, the two entities handle their own accounting systems, bank accounts, lines of credit and taxes. And, there is no overlap among the officers or members of the Boards of Directors. Therefore, the operations and the management of the two entities are substantially, but not entirely, interrelated.

There is, however, a discrete divide between the two entities. The Bariatric Center is an independent contractor for Scottsdale Healthcare. Neither entity controls the other. Each entity is solely responsible for the hiring, firing, promotion and discipline of its employees; that is, Scottsdale Healthcare played no role in the allegedly discriminatory termination. Therefore, there is no common ownership or financial control, and most critically, no centralization of labor relations. For these reasons, we cannot conclude that the Bariatric Center and Scottsdale Healthcare are integrated, and therefore, relief cannot be granted upon Myers' ADA and ACRA claims.

**II**

When Myers learned that she had cancer, she alerted Blackstone, and then relocated to Texas to begin cancer treatment. Meyers and Blackstone exchanged a few emails which suggested that Meyers would continue her work, and that Blackstone would hire another employee to provide support until she recovered. However, within a few days of those

---

[2] Defendants do not dispute these facts, but object to their evidentiary basis. The evidentiary objections are fruitless. Furthermore, the objections are moot because defendants prevail despite our consideration of the disputed evidence.

[3] Blackstone emphasizes that she holds that position in her individual, rather than corporate, capacity. However, the import of this distinction is unclear here, where she is the founder, sole shareholder and president of Scottsdale Bariatric.

1 emails, Meyers received a certified letter informing her that she had been discharged.
2 Because Blackstone is a former cancer specialist, Myers concluded that Blackstone's sudden
3 about-face meant that Blackstone believed that she would soon die from the cancer. Myers
4 further contends that Blackstone knew that her actions would cause Myers to believe that she
5 was going to die soon. Accordingly, Myers claims that Blackstone is liable for the
6 intentional infliction of emotional distress ("IIED").

7 "[A] determination that [an employment] discharge was lawful eliminates an [IIED]
8 cause of action based upon the wrongfulness of that discharge." Sees v. KTUC, Inc., 148
9 Ariz. 366, 369, 714 P.2d 859, 862 (Ct. App. 1985) (quoting Daniel v. Magma Copper Co.,
10 127 Ariz. 320, 324, 620 P.2d 699, 703 (Ct. App. 1980)). Defendants contend that if we
11 dismiss the ADA and ACRA claims, then the discharge is lawful, and therefore we must
12 grant summary judgment on the IIED claim. Myers fails to address this argument, and does
13 not claim that her discharge was otherwise unlawful. Myers therefore cannot prevail on the
14 IIED claim based upon the mere fact that she was discharged. However, Myers' claim is
15 different; it hangs upon the means by which she was discharged.

16 To state an IIED claim, a plaintiff must show that by extreme and outrageous conduct,
17 a defendant intentionally or recklessly caused her severe emotional distress. Ford v. Revlon,
18 Inc., 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987). The offending act must be "so outrageous
19 in character and so extreme in degree, as to go beyond all possible bounds of decency, and
20 to be regarded as atrocious and utterly intolerable in a civilized community." Mintz v. Bell
21 Atl. Sys. Leasing Int'l, Inc., 183 Ariz. 550, 554, 905 P.2d 559, 563 (Ct. App. 1995) (quotation
22 omitted).

23 This case is analogous in all material ways to Mintz. There, Tina Mintz was
24 hospitalized for severe emotional and psychological problems; her physician recommended
25 that she not immediately return to work; her employer knew of that admonition; her employer
26 nonetheless directed her to return to work; the stress of the job forced her back into the
27 hospital; and her employer then delivered a letter to her in the hospital informing her that her
28 job duties were reassigned. Id. The Arizona Court of Appeals concluded that because her

1 employer had a legitimate business purpose in seeing Mintz's work completed, "the bare fact
2 that [it] called Mintz back to work sooner than her doctor recommended or . . . hand
3 delivered a letter to Mintz in the hospital cannot be regarded as 'atrocious and utterly
4 intolerable in a civilized community,' even in light of Mintz's known susceptibility to
5 emotional problems." Id.  Myers does not distinguish Mintz, and we cannot.  Therefore,
6 although Blackstone's conduct was undoubtedly callous, it cannot subject her to liability on
7 this claim.

## III

Accordingly, **IT IS ORDERED GRANTING** defendants' motion for summary judgment (doc. 34).  All claims having been decided, the clerk is directed to enter final judgment for defendants.

DATED this 6th day of July, 2006.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge

- 5 -